**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:26-cv-05818

KAYLEEN FULTON,

*Plaintiff*,

v.

ETHEREUM ASIA PACIFIC LIMITED,
STIFTUNG ETHEREUM,
LIGHTSOURCE HR GLOBAL, LLC,
VENSURE EMPLOYER SERVICES, INC.,
BASTIAN AUE, and
VITALIK BUTERIN,

*Defendants*.

## COMPLAINT AND JURY DEMAND

Plaintiff Kayleen Fulton, through undersigned counsel, submits her Complaint and Jury Demand against Defendants Ethereum Asia Pacific Limited, Stiftung Ethereum, Lightsource HR Global, LLC, Vensure Employer Services, Inc., Bastian Aue, and Vitalik Buterin, and alleges as follows:

## I. NATURE OF THE ACTION

1. This is a case about an organization that fired a cancer patient thirteen days after she told its leadership, in writing, that she had cancer, and twelve days after she organized a respectful written objection, signed by half of her department, to a document that its board had ordered every employee to personally affirm under threat of termination. That document contained a suicide pledge, in the organization's own words, "to take his or her own life with a sword."

2. The Ethereum Foundation is the original steward of Ethereum, the second-largest blockchain network in the world, with a network value reported at roughly $300 billion and a treasury of its own reported in the hundreds of millions of dollars. Its board describes Ethereum, in the very document at the center of this case, as "a liberatory technology" meant to free people from power "imposed without true consent" and from environments "where dissent imposes a heavy price." Yet it failed to extend that principle to its own employees.

3. Ms. Fulton led the Foundation's Protocol Support team and facilitated All Core Developers, the open process through which the Ethereum protocol itself is upgraded. Seven months before she was fired, her supervisor rated her "Greatly exceeding expectations," called her work "pretty much textbook" for her level, and gave her a 21.9% raise. She was never criticized, disciplined, warned, or placed on a performance plan. She still runs the All Core Developers meetings today, from outside the Foundation, because the engineers who build Ethereum kept her on even though the Foundation did not.

4. On February 25, 2026, the Foundation's board distributed to all staff an organizational "Mandate" whose eleventh page reproduced a "Source Seppuku License" pledging that each "author, maintainer, editor or (re)distributor" would "take his or her own life with a sword" upon any failure to uphold its terms. Seventy-nine employees voted to remove it. One employee asked management in writing whether signing meant he was required to commit suicide. Another cited a colleague lost to suicide the year before. Board member Vitalik Buterin promised "significant changes." The board then published the Mandate on March 13 with the suicide pledge intact, word for word, now set in a cartoon typeface beside a winking anime figure and cartoon cats, and inscribed it permanently on the Ethereum blockchain.

5. One week later, on Friday, March 20, 2026, Co-Executive Director, Defendant Bastian Aue, issued an ultimatum to every employee: personally commit to the Mandate by Monday, or be treated as having resigned. Asked why the default was termination, he wrote: “It has to be default to leaving to ensure that everyone staying make an active commitment.” Asked who had agreed to include the suicide pledge, he wrote: “If you are asking more broadly who agreed with including it, I did.”

6. Ms. Fulton was diagnosed with ovarian cancer the day before. On March 24, 2026, she disclosed the diagnosis in writing to Mr. Aue, two members of the board, and the Foundation’s People Operations staff, told them she was beginning “an active treatment plan,” and asked that her employment status not be altered. She asked them to confirm receipt. Mr. Aue and both board members never responded. The head of People Operations sent a two-line personal note: “message received,” he was sorry to hear the news, and he hoped for a positive prognosis. No one asked about leave, accommodation, or her treatment, no one addressed her request that her job be left alone, and no one provided the notices the Family and Medical Leave Act requires.

7. On March 25, Ms. Fulton and a colleague, Trent Van Epps, sent the board a letter signed by 53 members of the Protocol cluster, roughly half of the department, which endorsed the Mandate’s direction, declined to affirm it under coercion, and stated that the signatories “do not resign.” On March 27, Mr. Aue announced that he would treat the signatories as committed and conceded that “[i]f I had the opportunity to redo it, I would certainly handle many aspects differently.” All 53 signatories kept their jobs. On April 6, 2026, Mr. Aue fired the only two people who had organized the letter, thirty minutes apart, and refused to tell either of them why. He told Ms. Fulton on the termination call that her “track record is good,” that she had “broad

support among colleagues," and that she had "not been found lacking in any of [her] responsibilities." He then offered to keep paying her salary for a year, so long as she worked somewhere else.

8. That afternoon, Defendants sent Ms. Fulton a release document of every claim she had, including her claims under the Americans with Disabilities Act and the Family and Medical Leave Act, and told her that if she did not sign it within three days she would be terminated with "no severance or other benefit." Her health insurance was ending in three weeks. Unable to find and retain a lawyer in three days, she signed under duress, received nothing, and rescinded the release through counsel eight days later.

9. Three and a half weeks after the firings, Mr. Buterin, a founder of Ethereum and a member of the Foundation's board, explained the terminations in a recorded conversation with Ms. Fulton. Asked how he would regard an organization that fired an employee for organizing immediately after she disclosed a cancer diagnosis, he did not dispute the premise. He answered that the question was "what kind of dynamics you want to reward inside of the EF," and that "if you reward making a stink with outcomes, then everyone will know that essentially making that kind of a show both internally and externally is the way to cause outcomes inside of the EF." That is a sitting board member describing the firing of a cancer patient as a deterrent.

10. Ms. Fulton brings this action under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"); the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"); the Colorado Anti-Discrimination Act, C.R.S. § 24-34-401 *et seq.* ("CADA"); C.R.S. § 24-34-407; and Colorado common law. She seeks back pay, front pay, liquidated damages, compensatory and punitive damages, statutory penalties, attorney fees and costs, and a declaration under 28 U.S.C. § 2201 that the separation agreement Defendants extracted from her

does not bar her claims and that no agreement requires her to arbitrate them, in Singapore or anywhere else.

## II. PARTIES

11. Plaintiff Kayleen Fulton is an individual who resides in Boulder County, Colorado. She has lived in Colorado since February 2025, the second month of her employment, and has been domiciled in Colorado, and a Colorado taxpayer, since November 2025. At all times relevant to this action, she performed her work for Defendants from Colorado. She is known professionally in the Ethereum community as "Nixo." Since 2021 she has also led EthStaker, a non-profit that teaches members of the public how to help operate the Ethereum network.

12. Defendant Ethereum Asia Pacific Limited ("EAPL") is a company incorporated in Singapore under Registration No. 201629253N, with its registered office at 45 North Canal Road, #01-01 Lew Building, Singapore 059301. EAPL is an affiliate of the Ethereum Foundation and is the entity on whose behalf Ms. Fulton was hired, supervised, and terminated. Mr. Aue signed Ms. Fulton's separation agreement on EAPL's behalf as its Co-Executive Director.

13. Defendant Stiftung Ethereum is a foundation organized under the laws of Switzerland with its seat at Zeughausgasse 7a, 6300 Zug, Switzerland (UID CHE-292.124.800), which does business as the Ethereum Foundation. Stiftung Ethereum's board of directors adopted and issued the Mandate described below and, together with EAPL's management, directs the work of the Foundation's staff regardless of which affiliated entity nominally engages them. EAPL and Stiftung Ethereum are referred to together herein as the "Foundation."

14. Defendant Lightsource HR Global LLC ("Lightsource") is, on information and belief, a Delaware limited liability company with its principal place of business at 2822

Commerce Park Drive, Suite 400, Orlando, Florida 32819. Lightsource, which identified itself in Ms. Fulton's offer letter as "Lightsource HR Global, LLC," hired Ms. Fulton "on behalf of Ethereum Asia Pacific Limited, an affiliate of Ethereum Foundation," and served as her "employer of record." It also referenced itself as Lightsource HR Global I, LLC, which may not exist as an entity.

15. Defendant Vensure Employer Services, Inc. ("Vensure") is, on information and belief, an Arizona corporation with its principal place of business in Chandler, Arizona. Vensure personnel administered Ms. Fulton's hiring, onboarding, payroll, and benefits, and corresponded with her and with her counsel using vensure.com email addresses. Vensure has never disclosed to Ms. Fulton the corporate relationship, if any, between Vensure and Lightsource, and Ms. Fulton does not know whether Lightsource is a subsidiary of Vensure.

16. Defendant Bastian Aue is an individual who was appointed Co-Executive Director of EAPL and of the Foundation in or about February or March 2026, following the resignation of its Executive Director, Tomasz Stańczak, and who has served as the Foundation's sole Executive Director since Ms. Hsiao-Wei Wang began a leave of absence on April 6, 2026 and then resigned. On information and belief, Mr. Aue resides in Europe and he communicated with Ms. Fulton throughout her employment, including on the day he fired her, from the email address bastian.aue@ethereum.org and through the Foundation's internal messaging platform. Mr. Aue issued the March 20, 2026 ultimatum, made and announced the decision to terminate Ms. Fulton, and signed her separation agreement. He is sued in his individual capacity.

17. Defendant Vitalik Buterin is an individual who is a founder of Ethereum and, at all relevant times, a member of the board of directors of Stiftung Ethereum. Mr. Buterin has no fixed residence known to Ms. Fulton; he travels continuously and his current whereabouts and

residential address are unknown. The ethereum.org email address he used while Ms. Fulton was employed now returns an automated reply stating that it is no longer in use. Mr. Buterin participated in the adoption and defense of the Mandate and the ultimatum, received Ms. Fulton's written objection to the ultimatum, and, on information and belief, approved, ratified, or acquiesced in the decision to terminate her. He is sued in his individual capacity.

18. At all relevant times, each of EAPL, Stiftung Ethereum, Lightsource, and Vensure was Ms. Fulton's "employer" within the meaning of 42 U.S.C. § 12111(5), 29 U.S.C. § 2611(4), and C.R.S. § 24-34-401(3), directly, as a joint employer, or as part of a single integrated employer, as alleged in Part V.A below. Those four Defendants are referred to collectively as the "Employer Defendants." Mr. Aue and Mr. Buterin are referred to together as the "Individual Defendants." At all relevant times each Individual Defendant acted, directly or indirectly, in the interest of the Employer Defendants with respect to Ms. Fulton, and each is an "employer" within the meaning of 29 U.S.C. § 2611(4)(A)(ii)(I) and 29 C.F.R. § 825.104(d), and a "person" within the meaning of C.R.S. § 24-34-402(1)(e).

## III. JURISDICTION AND VENUE

19. This Court has subject-matter jurisdiction over Ms. Fulton's ADA and FMLA claims under 28 U.S.C. §§ 1331 and 1343(a)(4), 42 U.S.C. § 12117(a), and 29 U.S.C. § 2617(a)(2).

20. This Court has supplemental jurisdiction over Ms. Fulton's claims under Colorado law and her claim for declaratory relief under 28 U.S.C. § 1367(a), because those claims arise from the same facts as her federal claims and form part of the same case or controversy. The Court may grant declaratory and further necessary relief under 28 U.S.C. §§ 2201 and 2202.

21. This Court has personal jurisdiction over each Defendant. Each purposefully directed its or his conduct at Colorado, and Ms. Fulton's claims arise out of that conduct. Among other things, Defendants (a) engaged and retained an employee they knew lived and worked in Colorado; (b) assigned, directed, and supervised work that she performed in Colorado every day; (c) paid her wages and provided her benefits in Colorado; (d) distributed the Mandate and the March 20 ultimatum to her in Colorado and demanded that she affirm it there; (e) received her written disclosure of her diagnosis and her written objection to the ultimatum, both sent from Colorado; (f) terminated her employment by video call while she was in Colorado; and (g) sent her a separation agreement that recites her Boulder, Colorado address and required her to execute it there.

22. The Foundation's contacts with Colorado are not limited to Ms. Fulton. Throughout 2025, approximately nine Foundation staff worked from a shared office in Boulder, Colorado, which Foundation personnel referred to as the "Boulder office." The office is managed by a Foundation employee, Matt Garnett, and the Foundation pays its rent. That group included at least one coordinator of the Foundation's Protocol cluster. On information and belief, the Foundation also maintained an internal communications channel for its Colorado personnel beginning in June 2025.

23. Mr. Aue is subject to personal jurisdiction in Colorado because he personally directed the conduct alleged here at a Colorado employee: he issued the ultimatum to her, received and ignored her medical disclosure, fired her by video call while she sat in Colorado, and signed the separation agreement that recites her Colorado address. Mr. Buterin is subject to personal jurisdiction in Colorado because he, as a board member, participated in adopting and defending a Mandate and ultimatum directed at the Foundation's Colorado employees, received

Ms. Fulton's written objection from Colorado, and, on information and belief, approved or ratified the decision to terminate a Colorado employee, the effects of which he knew would be felt in Colorado.

24. In the alternative, as to the federal claims against EAPL, Stiftung Ethereum, Mr. Aue, and Mr. Buterin, personal jurisdiction is proper under Federal Rule of Civil Procedure 4(k)(2), because those claims arise under federal law, those Defendants are not subject to the general jurisdiction of any state's courts, and exercising jurisdiction is consistent with the Constitution and laws of the United States.

25. EAPL, Stiftung Ethereum, Mr. Aue, and Mr. Buterin are located outside the United States. Singapore is not a signatory to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents, and the Convention does not apply where the address of the person to be served is not known. Each of these Defendants conducted the employment relationship with Ms. Fulton, and the conduct alleged here, almost entirely by email and video call using ethereum.org email addresses and the Foundation's internal messaging platforms, and EAPL has been represented since at least May 2026 by United States counsel who have corresponded with Ms. Fulton's counsel on its behalf. Ms. Fulton will move under Federal Rule of Civil Procedure 4(f)(3) for leave to serve these Defendants by email at the addresses through which they communicated with her, through EAPL's United States counsel, through the Foundation's registered addresses, and, as to Mr. Buterin, through the public social-media accounts he uses to communicate with the Ethereum community, and by any other means the Court permits and directs so as to afford due process.

26. Venue is proper in this District under 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to the claims occurred in Colorado; under 28 U.S.C. §

1391(c)(3), as to EAPL, Stiftung Ethereum, Mr. Aue, and Mr. Buterin, who do not reside in the United States; and under 42 U.S.C. § 12117(a), which incorporates 42 U.S.C. § 2000e-5(f)(3), because the unlawful employment practices were committed in Colorado, and but for them, Ms. Fulton would have continued working in Colorado.

## IV. ADMINISTRATIVE PREREQUISITES

27. On June 2, 2026, Ms. Fulton filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), Charge No. 541-2026-03589, against EAPL, Lightsource, and Vensure, alleging disability discrimination and retaliation under the ADA and CADA. She requested that the charge be cross-filed with the Colorado Civil Rights Division ("CCRD"). The charge was filed within 300 days of every act complained of in this action.

28. Although the charge did not name Stiftung Ethereum as a respondent, it identified EAPL as "an affiliate of the Ethereum Foundation," described the conduct of the Foundation's management, and alleged that EAPL, Lightsource, Vensure, and the Ethereum Foundation operate as an integrated enterprise. Stiftung Ethereum had actual notice of the charge through EAPL, shares management with EAPL, and has interests that are identical to EAPL's for purposes of conciliation and this action. Stiftung Ethereum was not prejudiced by its omission as a named respondent. The charge likewise identified Mr. Aue as the official who made and announced the termination decision.

29. On September 23, 2026, the EEOC's Denver Field Office issued Ms. Fulton a Notice of Right to Sue on Charge No. 541-2026-03589, a copy of which is attached as **Exhibit 1**. This action is filed within ninety days of her receipt of that notice.

30. On June 2, 2026, Ms. Fulton's counsel provided the EEOC charge to the CCRD. On June 3, 2026, the CCRD's Intake Unit responded in writing that, under the CCRD's

worksharing agreement with the EEOC, a separate filing with the CCRD would be a duplicate filing; that "[t]o the extent that dual-jurisdiction exists, the complaint filed with the EEOC may be deemed dual-filed with the CCRD for purposes of administrative exhaustion under Colorado law"; that the EEOC would be the investigating agency; and that "the CCRD will take no further action." A copy of the CCRD's response is attached as **Exhibit 2**. Dual jurisdiction exists because the charge alleged disability discrimination by employers that employed Ms. Fulton in Colorado, conduct that both the ADA and CADA prohibit. Ms. Fulton has therefore exhausted the proceedings and remedies available to her before the CCRD under C.R.S. § 24-34-306(14). Ms. Fulton will request a notice of right to sue from the CCRD when the 180-day period under C.R.S. § 24-34-306(15) expires on November 29, 2026, and will supplement this allegation under Fed. R. Civ. P. 15(d) on its issuance.

31. No administrative exhaustion is required for Ms. Fulton's claims under the FMLA, C.R.S. § 24-34-407, or Colorado common law, or for her claim for declaratory relief.

32. Ms. Fulton has separately filed an unfair labor practice charge with Region 27 of the National Labor Relations Board, Case No. 27-CA-388098, alleging violations of Sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act. That charge was docketed on June 2, 2026, and remains pending. This action does not assert any claim under the National Labor Relations Act, and nothing in the separation agreement described below could waive it.

## V. FACTUAL ALLEGATIONS

### A. The Foundation and Its Employment Structure

33. The Ethereum Foundation holds itself out as a non-profit organization that funds and staffs research and development of the Ethereum blockchain protocol. It operates through Stiftung Ethereum and affiliated entities, including EAPL. Its staff use ethereum.org email

addresses, communicate through a common internal messaging platform (Mattermost), and are organized into functional groups called "clusters," all managed by the same board and executive management regardless of which affiliate nominally engages them.

34. The Ethereum network the Foundation stewards has a reported market value of roughly $300 billion. The Foundation's own treasury is held mainly on the Ethereum blockchain, where it is publicly visible: crypto wallets publicly attributed to the Foundation hold more than 160,000 ETH, worth approximately $400 million, apart from any assets held off-chain. The Foundation's most recent published financial report covers 2024.

35. On March 30, 2026, Josh Stark, a member of the Foundation's senior management who, with the Co-Executive Directors, oversaw its staff, told employees: "Today the EF is about 250 people." More than 200 people worked for the Foundation when Ms. Fulton was fired, regardless of employment designation or labels. On information and belief, the Foundation employed more than fifty people in the United States during each of twenty or more calendar weeks in 2025 and in 2026.

36. The Foundation does not hire or directly pay its United States staff in its own name. Rather, it contracts with employer-of-record service companies, including Lightsource, to hire and pay those staff, while the Foundation's own management assigns, directs, supervises, evaluates, compensates, and terminates them.

37. From September 9, 2024 through December 31, 2024, Ms. Fulton provided services to EAPL as an independent contractor under a Contractor Services Agreement that, by its terms, expired on December 31, 2024. The Foundation then converted her to employment.

38. On December 30, 2024, Lightsource, on letterhead bearing its Orlando, Florida address, offered Ms. Fulton "employment with Lightsource HR Global, LLC on behalf of

Ethereum Asia Pacific Limited, an affiliate of Ethereum Foundation, in the capacity of Protocol Support Generalist." The position was full-time and remote, at a salary of $6,666.67 semi-monthly ($160,000 per year), with an employer contribution toward health insurance and a matching 401(k) plan. The offer reserved to Lightsource the right to terminate the employment at will. Lightsource's Division President signed it on behalf of "Lightsource HR Global I, LLC," and it directed Ms. Fulton's questions to a Lightsource employee using a vensure.com email address.

39. EAPL also required Ms. Fulton to sign an Intellectual Property & Confidentiality and Non-Disclosure Agreement with EAPL, dated as of January 1, 2025, which recited that she would "provide services to the Company" as part of her employment agreement with Lightsource. Ms. Fulton signed it in or about March or April 2025. She never received a counterpart executed by EAPL.

40. Throughout her employment, Lightsource processed Ms. Fulton's payroll, withheld her taxes, and administered her health and retirement benefits, but the Foundation solely assigned and directed her work, supervised and evaluated her, set her compensation, required her to comply with Foundation policies, and decided to wrongly terminate her. The Foundation drafted her separation agreement, which provides that payments to her would be made by EAPL "through Lightsource HR."

41. Each Employer Defendant exercised significant control over the essential terms and conditions of Ms. Fulton's employment, including hiring, termination, compensation, benefits, supervision, and the maintenance of employment records, and each is her joint employer. EAPL and Stiftung Ethereum are also a single employer: they have interrelated operations, common management, centralized control of labor relations, and common financial

control. Lightsource and Vensure each exercised control over Ms. Fulton's hiring, pay, and benefits through the same personnel, and each is her joint employer.

**B. Ms. Fulton's Employment and Performance**

42. Ms. Fulton began work on January 1, 2025, as a Protocol Support Generalist. Within eight months, she became the team lead of the Protocol Support team, a team of six people including herself.

43. Among her responsibilities, Ms. Fulton facilitated All Core Developers ("ACD"), the open coordination process through which changes to the Ethereum protocol are discussed and agreed. ACD is where the engineers who build Ethereum decide what will be built and when.

44. On September 3, 2025, her supervisor, Tim Beiko, completed her annual performance review. He rated her "Greatly exceeding expectations" and explained that she "[w]ent from IC to team lead and expanded the scope of PS's impact." He described her strength as "[c]leanly solving complex situations." He wrote that the Foundation's own career-track description for her level, which calls for an employee who owns a workstream end-to-end, delivers with growing independence, and improves team execution by shipping reliable outcomes, mentoring juniors, and introducing process improvements, was "pretty much textbook" for her. The review placed her at the IC3 level and awarded her a 21.9% raise, to a base salary of $195,000, effective in or about October 2025.

45. Beginning in 2026, the Foundation added an annual ETH bonus program to its compensation. Under the program, increases in an employee's total target compensation are paid as a bonus in ETH, rather than as base salary, until the bonus reaches a threshold that, for employees at Ms. Fulton's level, is 25% of base salary. For 2026 only, employees could elect to

receive that year's bonus payments in cash, monthly, instead of in ETH. Ms. Fulton made that election.

46. At no time during her employment did any Defendant criticize Ms. Fulton's performance, discipline her, place her on a performance plan, or warn her that her job was in jeopardy. There is no such document in her personnel file because no such document exists.

47. Ms. Fulton continues to facilitate All Core Developers today, from outside the Foundation. The Foundation fired her; the engineers who build Ethereum did not.

**C. The Mandate and the Foundation's Suicide Pledge**

48. On February 25, 2026, Foundation board member Aya Miyaguchi distributed to all staff a document titled "The Ethereum Foundation Mandate," version 1.4 (the "Mandate"). A true copy is attached as **Exhibit 3**.

49. The Mandate describes Ethereum as "a liberatory technology — not just from power relations that are imposed without true consent or where dissent imposes a heavy price, but even more importantly, from attempts to order reality itself in a way that leaves no alternative." It states that the Foundation "pair[s] high standards with kindness."

50. Page 11 of the Mandate reproduced, under the heading "SOURCE SEPPUKU LICENSE," a pledge that the "author, maintainer, editor or (re)distributor" shall "take his or her own life with a sword upon failure to uphold any of the pledges in this license, or upon modification or removal of any part of this license," followed by the line: "May we ritualistically fall on our own swords if we fail to uphold our solemn promise to Ethereum and the Infinite Garden." **Exhibit 3** at 11:

> We have kindred spirits who share our long term vision and gratefully adopt some of their words of wisdom as a lesson to us, below:
>
> **SOURCE SEPPUKU LICENSE**
>
> By inclusion of this license, the author, maintainer, editor or (re)distributor (the "Actor") of this software SHALL uphold the following pledges:
>
> To always make freely available and publicly accessible a full and accurate copy of the source code and associated documents of this software, including all modifications hereto by the Actor.
>
> To take his or her own life with a sword upon failure to uphold any of the pledges in this license, or upon modification or removal of any part of this license.
>
> May we ritualistically fall on our own swords if we fail to uphold our solemn promise to Ethereum and the Infinite Garden.

51. Objections from the Foundation's staff began the same day, in writing, on the Foundation's internal channels. On February 27, 2026, Mr. Van Epps wrote: "the seppuku license has got to go. if it's a litmus test for CROPS commitment, i'm failing it." On March 2, 2026, he posted a proposal to remove the license from the Mandate, and 79 employees voted in favor of removing it. Another employee, Raul Kripalani, wrote: "I have a new hire joining tomorrow. The first thing he's going to see on Town Square is a motion to drop a clause that mandates employees commit the ultimate sacrifice by falling on a sword." One employee asked management in writing whether signing meant he was required to commit suicide. Another cited a colleague the Foundation had lost to suicide the year before.

52. No one at the Foundation had to guess how its own employees read and interpreted the suicide pledge. They told the board, in writing, in the board's own channels, within days.

53. On March 5, 2026, board member Vitalik Buterin told staff that the Mandate was "continuing to be worked on with significant changes especially to the areas where people have expressed the most concern or confusion."

54. On March 13, 2026, the board published the final Mandate. A true copy is attached as **Exhibit 4**. The suicide pledge was not removed. Its text, including the pledge "[t]o take his or her own life with a sword," was reproduced verbatim, not a word changed, but as a small image at the foot of page 11, set in a Comic Sans–style typeface, tilted off-center, overlaid with a glitch effect, and surrounded by three cartoon cats and a winking anime figure. The word "seppuku" was removed from the machine-readable text of the document, so that it no longer appears in a search of the page. The only machine-readable text left on the page is a cartoon speech bubble reading: "May the Foundation fall on its own sword if it fails to uphold its solemn promise to Ethereum." **Ex. 4** at 11. The Foundation then inscribed the full document permanently on the Ethereum blockchain as transaction calldata.



55. The board had a poll, a week to reflect, and written objections in front of it, and it still chose to keep the pledge as a condition of employment. An organization does not spend a week redrawing a clause it regards as meaningless.

56. The Foundation's own engineers said so the day it was published. Marius van der Wijden wrote: "I must say I am deeply disappointed with the continued inclusion of the seppuku license. It seems like the revision of the positioning acknowledges that the board is not comfortable with making it front and center. It feels like it is positioned to be over-read by a casual reader. Thus it becomes a dog whistle for the people who are in the know." Mr. Beiko, Ms. Fulton's supervisor, wrote: "I don't see any benefit to the license being there, and am not sure why we care so much about signalling 'milady alignment' instead of simply explaining our beliefs in our terms." Another employee, Vinay Vasanji, was "genuinely surprised that we kept in the Seppuku License despite significant internal objection."

57. Mr. Buterin defended the choice the same day: "Being inoffensive like Mozilla was also a possible choice and would have been 100% CROPS compatible, but we feel that being inoffensive in that sense is not the energy we need right now."

58. The "milady alignment" Mr. Beiko referred to is the Mandate's visual styling, which is built throughout around imagery from "Milady Maker," an NFT project whose founder was publicly exposed in 2022 for operating accounts that promoted extreme, white-nationalist ideology and disturbing pro-anorexia content. Those controversies and messaging were widely known within the Ethereum developer community when the Mandate was published. Board members adopted Milady profile images, impliedly embracing such messaging.

59. Employees objected to the imagery as well. Board member and Co-Executive Director Hsiao-Wei Wang wrote that she "did not support applying the Milady aesthetic to a

1000-year vision mandate." Mr. Buterin's answer was that "the controversialness of those aesthetics is itself part of the point."

60. This, then, is the document that every Foundation employee was about to be ordered to personally affirm, on a deadline, on pain of termination: a vision statement wrapped in imagery with documented ties to white supremacy and the glorification of eating disorders, carrying a pledge to commit suicide by sword, kept in over the written objection of 79 employees, one of whom had lost a colleague to suicide.

61. On March 18, 2026, Ms. Fulton wrote on the Foundation's internal all-staff channel, under her own name, that she took "less issue with the Seppuku or Milady associations than with the idea that a near-unanimous opinion was visibly ignored and then dismissed," and that "there's little trust between the board and the rest of the organization." Ms. Wang, a member of the Foundation's board and its Co-Executive Director, replied publicly: "I think @nixo-ethereum.org's concern is critical for the future of the EF." Nineteen days later the Foundation fired Ms. Fulton for voicing that concern.

**D. The March 20 Ultimatum**

62. On the morning of Friday, March 20, 2026, Mr. Aue replied to Ms. Fulton on the all-staff channel: "We are now past the time of where it made sense to share concerns about the mandate, though. Now is the time for implementation."

63. About two hours later, Mr. Aue posted an announcement to all staff, followed by an all-staff email flagging "an important and time-sensitive message" and directing staff to it. The announcement stated that "[t]he Mandate is a strongly opinionated document. It is not for everyone," and that anyone for whom it did not resonate should "make the only honorable decision and leave the EF." It required every staff member to submit a form by the end of the day

on Monday, March 23, 2026, and warned: “Non-submission will be interpreted as a decision to leave.” Attached is **Exhibit 5**, a true and correct copy of the March 20, 2026 message.

64. The form offered two choices. The first read: “I personally commit to the direction set out in the mandate, I commit to help translate it into thoroughly reasoned strategies for my domain, and I commit to an exclusive and energetic focus on the mission critical tasks necessary for its implementation. From today and until my last day at the EF.” The second read: “I cannot confidently commit to the above and would like to request my extra months of compensation and leave the EF without undue delay.”

65. Explaining why failing to submit the form would be treated as a resignation, Mr. Aue wrote: “It has to be default to leaving to ensure that everyone staying make an active commitment.”

66. Staff asked the obvious question. One employee, Stefan Starflinger, wrote: “Could you please clarify if I sign this pad I don’t have to commit suicide?” Mr. Aue answered that the pledge was “part of the artwork of the mandate. A cultural reference like other elements in there. Chosen deliberately, but not meant to be taken literally.” Asked who had agreed to include it, he wrote: “If you are asking more broadly who agreed with including it, I did.” Later that day management “updated the form to specify that the commitment has nothing to do with literal seppuku.” Employees were thus asked to accept, on management’s word in a chat thread, that a clause the board had just spent a week redrawing rather than deleting did not mean what it said.

67. The next morning, Mr. Buterin wrote that the abruptness was deliberate: “Hard breaks of this type are exactly the thing that is not designed well by committee, hence the undemocratic nature of announcing this one.”

68. On March 23, 2026, the Foundation extended the deadline to Wednesday, March 25, 2026. It did not withdraw the requirement.

**E. Ms. Fulton's Diagnosis and Written Disclosure**

69. On March 3, 2026, Ms. Fulton underwent surgery. On Thursday, March 19, 2026, the day before the ultimatum, she learned the result: she was diagnosed with ovarian cancer.

70. On Saturday, March 21, 2026, Ms. Fulton emailed Mr. Aue, Mr. Buterin, Ms. Wang, and Ms. Miyaguchi. Using the words of the form itself, she wrote: "I affirm that I remain committed [to] the direction set out in the mandate and to translating it into thoroughly reasoned strategies for my domain, and I commit to an exclusive and energetic focus on the mission critical tasks necessary for its implementation." She explained that she, like many of her colleagues, did not feel represented by either option on the form, and that she did "not intend to signal my desire to end my tenure at the EF."

71. That evening, Ms. Fulton posted the same affirmation, under her own name, on the Foundation's all-staff channel. The next morning, Mr. Aue messaged her that he had "[j]ust read [her] email" and asked whether she had time for a call. On March 24, she questioned Mr. Aue again, publicly, on the all-staff channel, and he answered her directly.

72. On Tuesday, March 24, 2026, at 11:16 a.m. Mountain Time, Ms. Fulton sent an email with the subject line "Medical disclosure" to Mr. Aue, Ms. Wang, Ms. Miyaguchi, and Jose Cabrita of the Foundation's People Operations team. She wrote, in part:

> I'm writing to inform you that last Thursday, 19 March, I was diagnosed with cancer. I am currently working with my medical team with an active treatment plan and will keep you appropriately informed of any workplace impact as that plan develops.
>
> At this time, I am not requesting leave or accommodation. I remain fully committed and capable of performing my job responsibilities.
> . . .

> I want to be unambiguous: a decision not to sign is not a resignation. I have not resigned. I am not resigning. I intend to continue fulfilling my role and responsibilities as I have been.
>
> I respectfully ask that my employment status not be altered based on my decision not to fill out this form, and I welcome any conversation about a path forward.
>
> Please confirm receipt of this message.

73. Ms. Fulton's email told Defendants that she had a serious, life-threatening medical condition, that she was beginning treatment for it, and that the treatment was expected to affect her work at some point in the future. Her statement that she was not requesting leave or accommodation "[a]t this time" told them that she expected to need accommodations later when she had a clearer picture of her treatment plan. Her request that her employment status not be altered at that time was a request that Defendants refrain from the very action they took thirteen days later.

74. Mr. Aue did not respond to Ms. Fulton's email.

75. Ms. Wang did not respond to Ms. Fulton's email.

76. Ms. Miyaguchi did not respond to Ms. Fulton's email.

77. The only reply came from Mr. Cabrita, the head of People Operations, who wrote "message received," said he was sorry to hear the news, and hoped for a positive prognosis. He said nothing about her work, her job, leave, benefits, or likely future accommodations. No one from the Foundation, Lightsource, or Vensure ever asked Ms. Fulton about her treatment, her expected need for time off, or any accommodation; no one acknowledged her request that her employment status not be altered; and no Defendant ever provided her a notice of her eligibility for FMLA leave, a notice of her rights and responsibilities under the FMLA, or any other written information about medical leave.

78. As Ms. Fulton had anticipated, her treatment required a second surgery, on May 12, 2026, at which her cancer was determined to be stage III, and a course of six chemotherapy infusions, which began on July 7, 2026. Further surgery may be required. Absences for surgery and chemotherapy are absences for a serious health condition under the FMLA. 29 C.F.R. § 825.115(e)(2).

**F. The Protocol Letter**

79. Ms. Fulton was not the only employee who declined to submit the form and commit to the suicide pledge. Over March 24 and 25, 2026, members of the Foundation's Protocol cluster organized through a messaging channel from which Mr. Beiko had removed management and board members so that staff could speak freely. Ms. Fulton and Mr. Van Epps coordinated the drafting of a collective letter. Ms. Fulton advised her U.S.-based colleagues who did not intend to sign the form to "send the board and PeopleOps an email that states that you do not resign." Mr. Beiko cautioned the group that "walking away is not a viable option for many people, for different reasons (financial, benefits, etc.)."

80. At 4:26 p.m. Mountain Time on March 25, 2026, Ms. Fulton sent the letter from her Foundation email account to Mr. Aue, Ms. Wang, Ms. Miyaguchi, and all Foundation staff, and posted it on the all-staff channel under her own name. When sent, the letter bore 49 names, approximately 47% of the cluster's members. Four more colleagues added their names shortly afterward, for a total of 53. The letter stated:

> We endorse the general direction of the Mandate, but cannot in good faith affirm under these conditions. We intend to continue contributing to Ethereum in accordance with the values of CROPS and self-sovereignty. We will continue to perform the duties with which we are tasked and do not resign. Many of us have signed the commitment to the mandate under duress in fear of losing their jobs and livelihoods. We consider their responses on the poll to be coerced and meaningless.

81. Ms. Fulton's colleagues thanked her for it, in writing, on the Foundation's own channels. Caspar Schwarz-Schilling wrote: "In a way the letter gave us a bit our choice back, I'm grateful for it. Thank you nixo and @trent_vanepps!" Carl Beekhuizen wrote: "thank you @nixorokish and @trent_vanepps for coordinating this! i'm proud of everyone who took a stand." Marius van der Wijden wrote: "We are at 49/99 signatures? That's half of protocol. Whatever the future brings, I'm happy to stand with such courageous colleagues!" Sam Calder-Mason wrote: "Looks great, tyvm @trent_vanepps @nixorokish for getting this over the line." Josh Rudolf wrote: "Thank you to you + Nixo." Parithosh Jayanthi wrote: "We've definitely had our share of chaos at the EF, but i think it's the first time we actually managed some collective action!"

**G. The Foundation Accepts the Letter**

82. On March 27, 2026, Mr. Aue announced to all staff that he had "decided to acknowledge the signatures on the Protocol letter as expressions of frustrations with the process and form, while still acknowledging their separate commitments to the contents of the mandate," and that he had "invited people that did not submit the form at all to make a similar commitment." He wrote that he was "hopeful that we will not lose anyone that is committed to the content of the mandate and wants to continue working on Ethereum at the EF." He added: "If I had the opportunity to redo it, I would certainly handle many aspects differently," and "I take my personal responsibility for ensuring that the EF becomes an organization where nothing like this happens again very seriously."

83. From March 27, 2026 forward, therefore, the Foundation did not treat any employee's failure to submit the form as a resignation or as a ground for termination, and it treated the letter's signatories, including Ms. Fulton, as having made the required commitment.

Ms. Fulton had also made that commitment separately, in writing to Mr. Aue and the board and publicly to all staff, on March 21, 2026. The letter worked. All 53 signatories kept their jobs. Ten days later, the two who had organized the letter did not.

**H. April 6, 2026: The Foundation Fires Both Organizers**

84. At 8:10 a.m. Mountain Time on April 6, 2026, Mr. Aue posted to all staff a lengthy statement on decision-making at the Foundation and his four priorities as interim Co-Executive Director. Concerns, he wrote, may be raised "as input for their decisions, not as an attempt to pressure." "Tone is important here, especially in public spaces. If you find yourself getting heated, you are probably moving away from input and more towards pressure." If reasoned input does not produce change and that "damages your confidence in the EF," he wrote, then "it is likely better for both you, the EF, and Ethereum if you look for a way to contribute to Ethereum from outside the EF." One of his stated priorities was to "[e]nsure that we have the right mix of people to effectively execute on the direction set out in the Mandate without mission drift, without excessive organizational inertia, and without unnecessary disruption." Another concerned "the coming budget cuts required by the treasury management policy."

85. At 8:30 a.m. Mountain Time, twenty minutes after that post, Mr. Aue abruptly fired Mr. Van Epps, the only other organizer of the Protocol letter, on a video call, without explanation. Mr. Van Epps had no cancer diagnosis and no anticipated need for leave. The only thing he shared with Ms. Fulton was that the two of them had organized the letter.

86. At 9:00 a.m. Mountain Time, Mr. Aue told Ms. Fulton on a video call that he was terminating her employment. The meeting lasted thirty minutes. He told her that the decision was his alone and that he had lost confidence in her. In the same conversation he told her that her track record was good, that she had broad support among her colleagues, and that she had not

been found lacking in any of her responsibilities. He declined to give any reason for the termination. He did not say that her position was being eliminated or that the decision had anything to do with the Foundation's budget.

87. Instead, Mr. Aue proposed that the Foundation continue to fund Ms. Fulton's salary for a year if EthStaker, an outside organization in the Ethereum community, would engage her. The Foundation was thus prepared to keep paying her, so long as she no longer worked for the Foundation. Her termination was not a cost-saving measure.

88. Of the 53 people who signed the Protocol letter, the two who organized it were the two who were fired, thirty minutes apart, by the same man, neither given a reason.

89. The termination came thirteen days after Ms. Fulton's written disclosure of her cancer diagnosis, twelve days after she sent the Protocol letter, thirty-six days before her second surgery, and three months before she began chemotherapy, the treatment she had told Defendants was coming.

90. Neither Mr. Aue nor anyone else acting for any Defendant has ever identified any deficiency in Ms. Fulton's performance, any misconduct, any policy she violated, or any other reason for her termination. Not on the call. Not in the termination paperwork. Not in the six months since, during which Defendants have been represented by outside counsel.

91. On information and belief, Mr. Aue concluded that an employee about to begin cancer treatment could not provide the "exclusive and energetic focus" the Foundation was demanding of every employee, and that retaining her, with the time away from work and adjustments her treatment would require, was inconsistent with the "right mix of people" he intended to assemble.

92. Ms. Fulton pleads the cause of her termination in the alternative and cumulatively, as Federal Rule of Civil Procedure 8(d)(2)–(3) permits. Defendants have never stated any reason for terminating her. Whether or not Defendants were also motivated by Ms. Fulton's role in organizing the Protocol letter, her disability, her record of that disability, Defendants' perception of it, and her anticipated need for medical leave each was a but-for cause of her termination: had she not disclosed her cancer and the treatment that was coming, Defendants would not have terminated her. An event can have more than one but-for cause, and a defendant cannot avoid liability by pointing to some other factor that also contributed to its decision. Ms. Fulton's FMLA interference claim, moreover, does not depend on Defendants' intent at all.

93. That afternoon, Mr. Cabrita emailed Ms. Fulton, copying Mr. Aue, "to confirm the decision to end your employment." The email set her last day as April 10, 2026. On information and belief, Lightsource processed the termination and prepared her separation documentation.

94. Ms. Fulton's employment ended on April 10, 2026. In her farewell post to the organization that day, she stated that she had been fired "not for not signing, but for my vocal dissent . . . and coordinating organized criticism," and recounted Mr. Aue's praise of her work on the termination call. No one at the Foundation has ever contradicted that account.

95. Within the week, Mr. Aue announced that two of the three coordinators of the Protocol cluster, including Mr. Beiko, were leaving the Foundation and that the third was taking a sabbatical. Ms. Wang, the Co-Executive Director who had publicly endorsed Ms. Fulton's concern as "critical for the future of the EF," began a sabbatical on April 6, 2026, the day of the firings, and resigned on June 18, 2026. By September 2026 the Foundation had lost roughly

nineteen staff, including at least eight senior figures; Ms. Fulton's team had been dismantled; and most of the letter's 53 signatories had resigned or been terminated.

**I. The Separation Agreement and Its Rescission**

96. Mr. Cabrita's April 6 email, sent at 3:56 p.m., attached a Confidential Separation Agreement and General Release "dated today, 6 April 2026" (the "Separation Agreement") between Ms. Fulton and EAPL. The email asked her to return it signed by Thursday, April 9, 2026, and warned that if she did not, "we will issue you a termination notice on Friday, 10 April 2026, effective immediately. In this case, we will not be providing a severance or other benefit." A true and correct copy of the termination emailed dated April 6, 2026 is attached as **Exhibit 6**. A true and correct copy of the April 9, 2026 Separation Agreement is attached as **Exhibit 7**.

97. The email told her that her health coverage would end on April 30, 2026, after which she could continue it under COBRA at 100% of the premium plus a 2% fee.

98. The Separation Agreement gave Ms. Fulton "up to two (2) business days" to consider it, during which she could consult a lawyer "at Employee's own expense." Separation Agreement ¶ 6.

99. In exchange for a release of "all claims" arising from her employment and its termination, expressly including claims under the ADA and the FMLA, Separation Agreement ¶¶ 11–12, the Separation Agreement offered Ms. Fulton a choice between (a) "Option A," a promise by EAPL to use "reasonable endeavours" for ninety days to persuade a third party, EthStaker LLC, to engage her for twelve months, with an express disclaimer that EAPL "does not guarantee that any external organisation will agree to engage the Employee," and (b) "Option B," a payment of $25,680.28, derived from Mr. Aue's formula of one month of pay per year of service. *Id.* ¶ 4. It also offered a payment of $17,613.90, representing thirty-six months of the

Foundation's $357.66 monthly health-insurance contribution, grossed up for taxes at Ms. Fulton's request. *Id.* ¶ 5.

100. The Separation Agreement also required Ms. Fulton to keep its contents confidential, *id.* ¶ 9; to pay EAPL's attorney fees if she ever sued on a released claim, *id.* ¶ 13; and to resolve any dispute, "including the validity of this Agreement," by binding arbitration in Singapore under the rules of the Singapore International Arbitration Centre and under Singapore law, *id.* ¶ 17. It excluded from the release "rights resulting from unlawful conduct." *Id.* ¶ 10. It acknowledged that it could not waive Ms. Fulton's right to file a charge with the National Labor Relations Board. *Id.* ¶ 14.

101. When she received the proposed Separation Agreement, Ms. Fulton had been diagnosed with ovarian cancer eighteen days earlier, was facing a possible second surgery and chemotherapy, had just lost her job and her income, faced the loss of her health insurance within weeks, and had no lawyer representing her interests. She tried to retain counsel in the limited time allowed, but was unsuccessful.

102. Without legal counsel, Ms. Fulton asked by email that the draft Separation Agreement correct her state of residence, increase the health-insurance payment to cover the taxes on it so that it would actually cover what it promised, permit the disclosures to EthStaker that Option A itself required, and remove the onerous one-sided attorney-fee provision. Defendants have characterized those requests as an arm's-length negotiation. The opposite is true: this was an unrepresented cancer patient, given three days under duress, trying to make a document she could not refuse less harmful. Without the benefit of legal counsel and under duress, she signed the Separation Agreement on April 9, 2026.

103. On April 17, 2026, through counsel she was finally able to retain, Ms. Fulton rescinded the Separation Agreement in writing. Counsel sent the rescission to EAPL's management and to Lightsource and Vensure personnel, stated the grounds for rescission, stated that Ms. Fulton would not retain any consideration under it, and demanded that Defendants preserve all evidence relating to her employment, the Mandate, the ultimatum, the Protocol letter, and the terminations of Ms. Fulton and Mr. Van Epps.

104. Ms. Fulton has not retained any payment or consideration or other benefit under the Separation Agreement. On April 10, 2026, Defendants deposited $22,412.28 into her account, bundling her accrued paid-time-off payout with severance; she caused the entire deposit to be returned on April 17, 2026, the day she rescinded. After receiving the rescission, Defendants nonetheless attempted to pay her severance twice more: $10,795.15 on June 17, 2026, returned on June 22, 2026, and $15,015.90 on July 14, 2026, returned on July 15, 2026. The only sums Ms. Fulton retained were $10,704.46 in reimbursement of business expenses, deposited April 15, 2026, and $11,624.76 for her accrued paid time off, deposited separately on June 9, 2026, both of which Defendants owed her as a matter of law regardless of the Separation Agreement. EAPL never procured an engagement for Ms. Fulton with EthStaker LLC within the ninety-day period Option A contemplated, or at all, and EthStaker LLC has since ceased operations. Ms. Fulton later obtained employment on her own with EthStaker Inc., a separate entity, without any involvement by EAPL.

105. On May 14, 2026, EAPL, through counsel, rejected the rescission, asserted that the Separation Agreement is valid and binding and that its arbitration provision is enforceable, denied that Ms. Fulton "was subjected to unlawful conduct, economic duress, retaliation, or

termination in violation of public policy," and reserved "all rights with respect to tender, offset, or recoupment." The letter did not state a reason for Ms. Fulton's termination.

106. The confidentiality provision in paragraph 9 of the Separation Agreement limits Ms. Fulton's ability to disclose or discuss alleged discriminatory or unfair employment practices. It binds only Ms. Fulton, not EAPL. It does not state that Ms. Fulton may disclose the underlying facts to her immediate family, religious advisor, medical or mental health providers, or therapeutic support group; it does not state that disclosing those facts is not disparagement; and no signed addendum attesting to compliance with C.R.S. § 24-34-407 was attached to it.

**J. The Arbitration Provisions Defendants Have Invoked or May Invoke**

107. No agreement requires Ms. Fulton to arbitrate any claim asserted in this action, and no agreement commits the question of arbitrability to an arbitrator rather than to this Court. Defendants have invoked, or may invoke, five documents. None reaches these claims.

108. *The Separation Agreement, paragraph 17.* Paragraph 17 of the Separation Agreement provides that "[a]ll disputes arising out of or in connection with this Agreement or its performance (including the validity of this Agreement) shall be settled by binding arbitration administered by the Singapore International Arbitration Commission [sic] under its rules," with the "place of arbitration" in Singapore, and that the Agreement "is to be construed and governed in accordance with the laws of Singapore." It provides that "[a]ll costs of arbitration . . . shall be apportioned in the arbitral award." EAPL, through counsel, has asserted that paragraph 17 requires arbitration of "disputes concerning the validity or enforceability of the Agreement."

109. Paragraph 17 does not reach the claims in this action. By its terms it is limited to disputes "arising out of or in connection with this Agreement or its performance." It does not refer to Ms. Fulton's employment, to its termination, or to any claim arising from them. Every

claim in this action arises from Defendants' conduct on and before April 6, 2026, before the Separation Agreement existed. Those claims do not arise out of the Separation Agreement, and they would exist in identical form had the Separation Agreement never been drafted.

110. Independently of any defect in the Separation Agreement as a whole, paragraph 17 itself, and any purported delegation to an arbitrator of the question whether paragraph 17 is valid or applicable, is void and unenforceable for reasons specific to that paragraph. Ms. Fulton did not knowingly, voluntarily, or clearly and unmistakably agree to submit to a Singapore tribunal, under Singapore law, the question whether her federal and Colorado statutory claims survive, or the question whether she must arbitrate them. Paragraph 17 was presented to her, as part of a document dated the day she was fired, with a demand that she sign within three days or receive "no severance or other benefit," eighteen days after a cancer diagnosis, three weeks before her health insurance was to lapse, without the benefit or time to retain counsel, and without any explanation of what arbitration in Singapore under Singapore law would mean for a Colorado employee asserting rights under United States law. Paragraph 17 was procured by that economic duress, and it is unconscionable: it is a non-negotiable term in a contract of adhesion drafted by EAPL; it requires a terminated Colorado employee undergoing cancer treatment to pursue her claims before a tribunal on the other side of the world; it subjects her to the apportionment of the costs of that tribunal; it strips her of United States substantive law; and it is paired, in paragraph 13, with a one-sided obligation to pay EAPL's attorney fees if she sues.

111. Paragraph 17 also operates as a prospective waiver of Ms. Fulton's rights and remedies under the ADA, the FMLA, and CADA. Singapore law does not provide the rights, remedies, burdens of proof, or fee-shifting those statutes provide; it does not recognize the requirement that a release of federal statutory claims be knowing and voluntary under the totality

of the circumstances; and an arbitrator bound by paragraph 17 to apply Singapore law could neither adjudicate Ms. Fulton's statutory claims nor apply United States law to the enforceability of the release EAPL would assert against them. The combined effect of the Singapore forum clause and the Singapore choice-of-law clause is that Ms. Fulton's federal and Colorado statutory rights would be extinguished without ever being adjudicated under the law that creates them.

112. Paragraph 17 is further "null and void, inoperative or incapable of being performed" within the meaning of Article II(3) of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. § 201 *et seq.*, because the Separation Agreement was rescinded on April 17, 2026, because no consideration was ever given or retained under it, and because it was procured by duress.

113. Only EAPL is a party to the Separation Agreement. Stiftung Ethereum, Lightsource, Vensure, Mr. Aue, and Mr. Buterin did not sign it, are not parties to paragraph 17, and cannot invoke it. Ms. Fulton's claims against those Defendants do not depend on, and do not seek to enforce, any term of the Separation Agreement.

114. *Vensure's form "Mutual Agreement to Arbitrate."* Vensure uses a form document titled "Mutual Agreement to Arbitrate Employment-Related Disputes" between "Vensure Employer Services, Inc. and each of its subsidiaries (collectively the 'EOR')" and a "Covered Employee." Ms. Fulton has no recollection or record of having signed that document. The only copy of it in her possession, retained from her onboarding materials, bears her printed name and no signature, and she has been unable to locate an executed copy. No Defendant has ever produced a copy signed by Ms. Fulton, and no Defendant has ever invoked it. Any Defendant seeking to enforce that form bears the burden of proving that Ms. Fulton signed it.

115. Even if Vensure could prove that Ms. Fulton assented to its form, that document does not reach the claims in this action against the Foundation or the Individual Defendants. It covers claims "arising out of Covered Employee's employment with the EOR and the termination thereof, including claims Covered Employee may have against the EOR or against its officers, directors, supervisors, managers, employees, or agents." The "EOR" is defined as Vensure "and each of its subsidiaries." The document refers, in its first sentence, to the Covered Employee's "work-site employer," and then nowhere extends its coverage to the work-site employer, to the work-site employer's affiliates, or to their officers or directors. EAPL, Stiftung Ethereum, Mr. Aue, and Mr. Buterin are not the EOR and are not its officers, directors, managers, or agents. Lightsource has never been shown to be a subsidiary of Vensure. Vensure's form also provides, in paragraph 12, that "[e]ither party may bring an action in court . . . to otherwise determine the arbitrability of claims under this Agreement," and, in paragraph 2, that its own terms govern over any inconsistent provision of the AAA rules. The form therefore commits questions of arbitrability to the courts, not to an arbitrator.

116. *EAPL's 2026 Supplemental Agreement.* On or about January 1, 2026, EAPL presented at least some United States employees with a "Supplemental Agreement" governing confidentiality, intellectual property, an ETH bonus plan, and compliance with EAPL policies, which provides in paragraph 10.2 that "[a]ny disputes arising under or in connection with this Agreement" shall be arbitrated in New York before the American Arbitration Association. Ms. Fulton did not sign a Supplemental Agreement. Even for employees who did, that clause is limited to disputes under the Supplemental Agreement itself; claims for disability discrimination, retaliation, interference with medical leave, outrageous conduct, and wrongful discharge do not arise under or in connection with a confidentiality and intellectual-property agreement. In the

alternative, to the extent EAPL contends that the Separation Agreement is valid, paragraph 16 of the Separation Agreement "supersedes all prior written or verbal agreements and any other contractual . . . relationship or agreements between the Parties."

117. *The expired 2024 Contractor Services Agreement.* The Contractor Services Agreement under which Ms. Fulton provided services to EAPL from September 9, 2024 through December 31, 2024, and the confidentiality agreement attached to it, each contain a clause providing that disputes "arising out of or in connection with this Agreement or its performance" shall be arbitrated before the Singapore International Arbitration Centre under Singapore law. Those agreements governed a non-exclusive, hourly, independent-contractor engagement that by its own terms ended on December 31, 2024, before Ms. Fulton's employment began. Ms. Fulton signed and returned the Contractor Services Agreement but never received a counterpart executed by EAPL, which clause 16 of that agreement required before it would "come into force." The claims in this action arise from Ms. Fulton's subsequent employment and its termination in April 2026, not from the contractor engagement or its performance, and the Contractor Services Agreement's arbitration clause does not reach them. Any delegation of arbitrability in that clause is coextensive with the clause itself, is limited to disputes arising out of or in connection with the contractor engagement, and expired with it; whether an agreement to arbitrate exists at all between Ms. Fulton and EAPL with respect to her later employment relationship is a question for this Court. To the extent EAPL contends that the Separation Agreement is valid, its paragraph 16 superseded the Contractor Services Agreement in any event.

118. *EAPL's 2025 IP & NDA.* The Intellectual Property & Confidentiality and Non-Disclosure Agreement dated as of January 1, 2025 governs Ms. Fulton's handling of EAPL's confidential information and the ownership of intellectual property. Its clause 7.2 provides that

"[a]ny disputes arising under or in connection with this Agreement" shall be arbitrated in New York before the American Arbitration Association, with New York law governing. That clause reaches disputes about confidential information and intellectual property; it does not reach claims that EAPL discriminated against Ms. Fulton because of her disability, retaliated against her, interfered with her medical leave, or discharged her in violation of public policy, none of which arises under or in connection with a confidentiality and intellectual-property agreement. Ms. Fulton never received a counterpart executed by EAPL, which clause 8 required before the agreement would "come into force." In the alternative, to the extent EAPL contends that the Separation Agreement is valid, paragraph 16 of the Separation Agreement superseded the IP & NDA and its arbitration clause.

119. Ms. Fulton has not agreed to arbitrate the claims in this action with any Defendant, has not agreed to delegate to any arbitrator the question whether she must do so, and is entitled to have that question decided by this Court.

**K. Mr. Buterin's Recorded Admission**

120. On May 1, 2026, at the Soldøgn Interop conference in Longyearbyen, Svalbard, Norway, Ms. Fulton spoke with Mr. Buterin about her termination. Ms. Fulton was responsible for recording the conference sessions. In the middle of her conversation with Mr. Buterin, a colleague brought her the recording device, and the remainder of the conversation was recorded. Norway permits a single participant in a conversation to record it, i.e., it is a one-party-consent jurisdiction.

121. Ms. Fulton asked Mr. Buterin how he would regard an organization that fired an employee for organizing immediately after she disclosed a cancer diagnosis. Mr. Buterin did not dispute the premise. He did not say that Ms. Fulton had been fired for her performance, for

budget reasons, or for any reason other than the one she described. He answered instead that the issue was "people's instincts about individual social situations and what kind of social situation is tenable to have inside," that "what kind of dynamics you want to reward inside of the EF is the question," and that "if you reward making a stink with outcomes, then everyone will know that essentially making that kind of a show both internally and externally is the way to cause outcomes inside of the EF."

122. Mr. Buterin also conceded that, in retrospect, employees should have been given weeks to decide whether to affirm the Mandate rather than three days.

123. Mr. Buterin's account is that of a sitting board member of the organization that fired Ms. Fulton, offered three and a half weeks after the fact. It explains her termination as a deterrent: the organizers of the Protocol letter were removed so that the remaining staff would learn that organizing does not "cause outcomes inside of the EF." It is not the account of a rogue manager, and it is not one the Foundation can disavow.

**L. Ms. Fulton's Damages**

124. As a result of her termination, Ms. Fulton has lost her salary of $195,000 per year, her eligibility for the Foundation's annual ETH bonus program, the employer contribution to her health insurance, her 401(k) matching contributions, and other benefits of employment.

125. Her employer-provided health coverage ended on April 30, 2026, twelve days before her second cancer surgery. Defendants then removed the plan she had been on, so that the COBRA continuation they had promised her was not available on the same terms. Her premium on that plan had been $880.98 per month. The replacement plan into which she would have been placed by default cost $1,264.30 per month, 44% more. She elected a plan costing $1,022.05 per

month, 16% more than before, with a higher deductible, a higher out-of-pocket maximum, and coinsurance, for materially worse coverage during chemotherapy.

126. Ms. Fulton has suffered and continues to suffer emotional distress, anxiety, humiliation, and loss of professional standing as a result of being fired in the first weeks after a cancer diagnosis, without explanation, by an organization that had just ordered her to affirm a suicide pledge, while facing the loss of her health insurance during treatment, and then being given three days to sign away her rights or lose even the health stipend she had been offered.

127. Ms. Fulton has made reasonable efforts to mitigate her damages. She has worked through her treatment, first on part-time contract work and, since August 2026, in full-time employment with EthStaker Inc. under three-month contracts whose funding beyond October 31, 2026 is uncertain. Her field is narrow, and comparable, stable full-time positions are scarce. The field has contracted further since her termination, as the Foundation has shed dozens of experienced protocol staff into the same small market.

128. Defendants acted intentionally, willfully and wantonly, with malice, and with reckless indifference to Ms. Fulton's federally and state protected rights. Their violation of the FMLA was willful, and they did not act in good faith or with reasonable grounds for believing their conduct complied with the FMLA.

## VI. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Disability Discrimination — Discriminatory Discharge**
**Americans with Disabilities Act, 42 U.S.C. § 12112(a)**
**(Against the Employer Defendants)**

129. Ms. Fulton incorporates the preceding paragraphs.

130. Each Employer Defendant is a “covered entity” and an “employer” under 42 U.S.C. § 12111(2) and (5), engaged in an industry affecting commerce and employing fifteen or more employees for each working day in twenty or more calendar weeks in 2025 and 2026, directly and through joint and integrated employment.

131. Ms. Fulton is an individual with a disability under 42 U.S.C. § 12102(1). Cancer substantially limits the major bodily function of normal cell growth. 42 U.S.C. § 12102(2)(B); 29 C.F.R. § 1630.2(j)(3)(iii). Ms. Fulton also has a record of that impairment, and Defendants regarded her as having it. 42 U.S.C. § 12102(1)(B)–(C), (3).

132. Ms. Fulton is a “qualified individual” under 42 U.S.C. § 12111(8). She was performing all of the essential functions of her position, at a level Defendants rated “Greatly exceeding expectations,” and Defendants told her when they fired her that she had not been found lacking in any of her responsibilities.

133. The Foundation knew of Ms. Fulton’s disability no later than March 24, 2026, when she disclosed it in writing to its Co-Executive Director, two board members, and its People Operations staff.

134. The Employer Defendants discharged Ms. Fulton because of her disability, in violation of 42 U.S.C. § 12112(a). Her disability was a but-for cause of the termination, as shown by, among other things, the thirteen days between her written disclosure and her termination; the identity of the person who received the disclosure and the person who made the decision; Defendants’ refusal, then and since, to give any reason for the termination; their praise of her performance in the same conversation in which they fired her; their offer to keep funding her salary for a year so long as she worked somewhere else; the silence of the decision-maker and both board members in response to her disclosure; Mr. Aue’s stated intention that morning to

assemble the "right mix of people" to deliver an "exclusive and energetic focus"; and their acceptance, by March 27, 2026, of her written commitment to the Mandate.

135. EAPL and Stiftung Ethereum made the decision to discharge Ms. Fulton. Lightsource and Vensure, as her employer of record and joint employers, effectuated the discharge and are jointly and severally liable for it.

136. The Employer Defendants acted with malice or with reckless indifference to Ms. Fulton's federally protected rights.

137. As a direct result, Ms. Fulton has suffered and will continue to suffer lost wages and benefits, emotional distress, and other damages. She is entitled to back pay, front pay, compensatory and punitive damages, and her attorney fees and costs under 42 U.S.C. §§ 12117(a), 12205, and 1981a.

## SECOND CLAIM FOR RELIEF
## Retaliation and Interference
## Americans with Disabilities Act, 42 U.S.C. § 12203(a)–(b)
## (Against the Employer Defendants)

138. Ms. Fulton incorporates the preceding paragraphs.

139. Ms. Fulton engaged in activity protected by the ADA when, on March 24, 2026, she disclosed her disability to Defendants in writing, informed them that she was beginning an active treatment plan that would affect her work, reserved her right to request leave or accommodation as that plan developed, and asked that her employment status not be altered. A request that an employer refrain from adverse action on account of a disclosed disability, and a statement that accommodation may be needed, are protected activity. 42 U.S.C. § 12203(a).

140. Thirteen days later, the Employer Defendants discharged Ms. Fulton. The temporal proximity between her protected activity and her discharge, together with the facts alleged above, establishes that the discharge was caused by her protected activity.

141. The Employer Defendants also coerced, intimidated, threatened, and interfered with Ms. Fulton in the exercise and enjoyment of her rights under the ADA, in violation of 42 U.S.C. § 12203(b), by discharging her before she could request the accommodation and leave her treatment required, by failing to respond substantively to her disclosure, and by conditioning any severance or health-insurance assistance on her release of her ADA claims within three days.

142. The Employer Defendants acted with malice or with reckless indifference to Ms. Fulton's federally protected rights.

143. As a direct result, Ms. Fulton has suffered and will continue to suffer lost wages and benefits, emotional distress, and other damages, and is entitled to the relief provided by 42 U.S.C. §§ 12117(a), 12203(c), and 12205.

**THIRD CLAIM FOR RELIEF**
**Interference with FMLA Rights**
**Family and Medical Leave Act, 29 U.S.C. § 2615(a)(1)**
**(Against All Defendants)**

144. Ms. Fulton incorporates the preceding paragraphs.

145. Each Employer Defendant is an "employer" under 29 U.S.C. § 2611(4), engaged in commerce or an industry affecting commerce and employing fifty or more employees for each working day during twenty or more calendar workweeks in 2025 and in 2026. Employees jointly employed by more than one employer are counted by each of them. 29 C.F.R. § 825.106(d).

146. Each Individual Defendant is also an "employer" under 29 U.S.C. § 2611(4)(A)(ii)(I) because each acted, directly or indirectly, in the interest of the Employer

Defendants with respect to Ms. Fulton. Mr. Aue controlled the terms and conditions of her employment and personally made and carried out the decision to terminate her. Mr. Buterin, as a member of the Foundation's board, participated in the adoption and enforcement of the Mandate and the ultimatum that led to her termination and, on information and belief, approved, ratified, or acquiesced in the termination decision and has publicly defended it. Corporate officers and directors who act in the interest of an employer are individually liable under the FMLA. 29 C.F.R. § 825.104(d).

147. Mr. Aue possessed and exercised the power to discharge Ms. Fulton, to control her work, and to approve or deny her leave, and he exercised that power when he fired her.

148. Ms. Fulton was an "eligible employee" under 29 U.S.C. § 2611(2). When Defendants terminated her, she had been employed for more than twelve months and had worked more than 1,250 hours in the preceding twelve months. Because she worked remotely and was jointly employed, her worksite for purposes of the FMLA is the office of her primary employer from which her work was assigned or to which she reported, 29 C.F.R. § 825.111(a)(2)–(3), and on information and belief Defendants employed fifty or more employees within seventy-five miles of that worksite.

149. Ms. Fulton had a "serious health condition" under 29 U.S.C. § 2611(11): stage III ovarian cancer requiring continuing treatment by a health care provider, including two surgeries and six infusions of chemotherapy. 29 C.F.R. §§ 825.113, 825.115(e)(2).

150. Ms. Fulton's March 24, 2026 email gave Defendants actual notice that she had a serious health condition, that she was beginning treatment for it, and that the treatment would affect her work. That notice obligated Defendants to provide her with notice of her FMLA

eligibility and of her rights and responsibilities under the FMLA within five business days. 29 C.F.R. § 825.300(b)–(c). They failed to do so.

151. Ms. Fulton was entitled to FMLA leave for her treatment and to restoration to her position on her return. 29 U.S.C. §§ 2612(a)(1)(D), 2614(a).

152. Defendants interfered with, restrained, and denied Ms. Fulton's exercise of her FMLA rights, in violation of 29 U.S.C. § 2615(a)(1), by failing to give her the required notices and by terminating her employment thirteen days after she notified them of her condition, before she could take the leave her treatment required.

153. Ms. Fulton's termination was related to her serious health condition and her anticipated need for leave. Defendants cannot show that they would have terminated her regardless of that need; they have never stated any reason for terminating her at all.

154. In a joint-employment relationship, the primary employer is responsible for giving the required FMLA notices and providing FMLA leave, 29 C.F.R. § 825.106(c), and every joint employer must comply with the FMLA's prohibited-acts provisions, *id.* § 825.106(e). Each Defendant is jointly and severally liable.

155. Defendants' violation was willful and intentional.

156. As a direct result, Ms. Fulton has lost wages, salary, employment benefits, and other compensation. She is entitled to those damages with interest, to an equal amount as liquidated damages, to equitable relief including front pay, and to her attorney fees, expert fees, and costs. 29 U.S.C. § 2617(a)(1), (3).

**FOURTH CLAIM FOR RELIEF**
**Retaliation**
**Family and Medical Leave Act, 29 U.S.C. § 2615(a)(2)**
**(Against All Defendants)**

157. Ms. Fulton incorporates the preceding paragraphs.

158. Ms. Fulton engaged in activity protected by the FMLA when she notified Defendants on March 24, 2026 of her serious health condition and her anticipated need for leave.

159. Defendants terminated Ms. Fulton's employment thirteen days later. The termination was motivated by her protected activity, as shown by the temporal proximity between her notice and her termination, Defendants' refusal to state any reason for the termination, their praise of her performance when they fired her, and Mr. Aue's stated intention to assemble a workforce capable of an "exclusive and energetic focus."

160. Defendants' conduct violated 29 U.S.C. § 2615(a)(2) and 29 C.F.R. § 825.220(c), and was willful.

161. As a direct result, Ms. Fulton has suffered the damages described above and is entitled to the relief provided by 29 U.S.C. § 2617(a).

**FIFTH CLAIM FOR RELIEF**
**Disability Discrimination**
**Colorado Anti-Discrimination Act, C.R.S. § 24-34-402(1)(a)**
**(Against the Employer Defendants)**

162. Ms. Fulton incorporates the preceding paragraphs.

163. Each Employer Defendant is an "employer" under C.R.S. § 24-34-401(3) because it employed Ms. Fulton within the State of Colorado.

164. Ms. Fulton has a disability as defined in C.R.S. § 24-34-301 and is otherwise qualified to perform her job.

165. The Employer Defendants discharged Ms. Fulton because of her disability, in violation of C.R.S. § 24-34-402(1)(a).

166. Ms. Fulton has satisfied the conditions precedent to this claim as alleged in Part IV.

167. The Employer Defendants acted with malice or reckless indifference to Ms. Fulton's rights under Colorado law, and their conduct was willful and wanton.

168. As a direct result, Ms. Fulton has suffered and will continue to suffer lost wages and benefits, emotional distress, and other damages. She is entitled to back pay, front pay, compensatory and punitive damages, and her attorney fees and costs under C.R.S. § 24-34-405.

**SIXTH CLAIM FOR RELIEF**
**Retaliation**
**Colorado Anti-Discrimination Act, C.R.S. § 24-34-402(1)(e)(IV)**
**(Against the Employer Defendants)**

169. Ms. Fulton incorporates the preceding paragraphs.

170. Ms. Fulton opposed a practice made unlawful by CADA when, on March 24, 2026, she disclosed her disability, informed Defendants that she would need to address its treatment, and asked that her employment status not be altered on that account.

171. The Employer Defendants discharged Ms. Fulton thirteen days later because of that opposition, in violation of C.R.S. § 24-34-402(1)(e)(IV).

172. Ms. Fulton has satisfied the conditions precedent to this claim as alleged in Part IV.

173. The Employer Defendants acted with malice or reckless indifference to Ms. Fulton's rights under Colorado law, and their conduct was willful and wanton.

174. As a direct result, Ms. Fulton has suffered the damages described above and is entitled to the relief provided by C.R.S. § 24-34-405.

**SEVENTH CLAIM FOR RELIEF**
**Aiding, Abetting, Inciting, Compelling, and Coercing Discriminatory and Unfair Employment Practices**
**Colorado Anti-Discrimination Act, C.R.S. § 24-34-402(1)(e)(I)**
**(Against Bastian Aue and Vitalik Buterin)**

175. Ms. Fulton incorporates the preceding paragraphs.

176. C.R.S. § 24-34-402(1)(e)(I) makes it a discriminatory or unfair employment practice "[f]or any person, whether or not an employer," to "aid, abet, incite, compel, or coerce the doing of any act defined in this section to be a discriminatory or unfair employment practice."

177. Mr. Aue aided, abetted, incited, compelled, and coerced the Employer Defendants' discriminatory and retaliatory discharge of Ms. Fulton. He received her written disclosure of her disability, ignored it, decided to discharge her thirteen days later, announced that the decision was "[his] alone," carried it out, and signed the Separation Agreement by which the Employer Defendants attempted to extract a release of her disability-discrimination claims within three days.

178. Mr. Buterin aided, abetted, incited, compelled, and coerced the same discriminatory and retaliatory practices. He participated as a board member in adopting and defending the Mandate and the ultimatum; received Ms. Fulton's written objection to the ultimatum and her affirmation that she had not resigned; on information and belief approved, ratified, or acquiesced in the decision to discharge her; and, after the fact, publicly explained and defended her discharge as a means of ensuring that employees who "mak[e] a stink" do not obtain "outcomes inside of the EF."

179. Ms. Fulton has satisfied the conditions precedent to this claim as alleged in Part IV.

180. The Individual Defendants acted with malice or reckless indifference to Ms. Fulton's rights under Colorado law, and their conduct was willful and wanton.

181. As a direct result, Ms. Fulton has suffered the damages described above and is entitled, as against each Individual Defendant, to compensatory and punitive damages and her attorney fees and costs under C.R.S. § 24-34-405.

**EIGHTH CLAIM FOR RELIEF**
**Unlawful Nondisclosure Provision**
**C.R.S. § 24-34-407**
**(Against EAPL and Stiftung Ethereum)**

182. Ms. Fulton incorporates the preceding paragraphs.

183. C.R.S. § 24-34-407(1) provides that a nondisclosure provision that limits an employee's ability to disclose or discuss alleged discriminatory or unfair employment practices is void unless, among other things, it applies equally to all parties to the agreement; expressly states that it does not restrain the employee from disclosing the underlying facts of any alleged discriminatory or unfair employment practice, including to her immediate family, religious advisor, medical or mental health provider, therapeutic support group, or legal counsel, or to a government agency; expressly states that disclosure of the underlying facts does not constitute disparagement; and is accompanied by an addendum, signed by all parties, attesting to compliance with the statute.

184. Paragraph 9 of the Separation Agreement is a nondisclosure provision within the meaning of C.R.S. § 24-34-407. It binds only Ms. Fulton; it contains none of the required statements; and no compliant addendum was attached to it.

185. EAPL presented the Separation Agreement to Ms. Fulton on April 6, 2026, and demanded that she sign it within three days. Stiftung Ethereum, as EAPL's single and joint employer, is jointly liable for that conduct.

186. Under C.R.S. § 24-34-407(2), an employer that presents an employee with a nondisclosure provision that violates subsection (1) is liable for a penalty of $5,000 per violation, and the employee may recover her actual damages, reasonable costs, and attorney fees in a private action.

187. Ms. Fulton is entitled to a declaration that paragraph 9 of the Separation Agreement is void, to her actual damages, to the statutory penalty, and to her reasonable costs and attorney fees.

**NINTH CLAIM FOR RELIEF**
**Wrongful Discharge in Violation of Public Policy**
**Colorado Common Law**
**(Against the Employer Defendants)**

188. Ms. Fulton incorporates the preceding paragraphs.

189. Colorado recognizes a claim for wrongful discharge where an employer directs an employee to perform an act that violates a clear mandate of public policy, or to refrain from exercising a right or privilege protected by public policy, and discharges the employee for refusing.

190. The Employer Defendants directed Ms. Fulton, on pain of termination, to personally affirm and commit herself to a document containing a pledge to take her own life with a sword upon any failure to uphold its terms, and to do so within days, over the documented objection of 79 of her colleagues, including one who had recently lost a colleague to suicide. Ms. Fulton declined to affirm the document in that form, told the Employer Defendants in writing

that she had not resigned and would continue to perform her duties, and organized a lawful, respectful written objection by her colleagues.

191. Colorado has a clear and substantial public policy, expressed in its Constitution and statutes, against coerced personal affirmations of this kind, against the promotion of suicide, and in favor of suicide prevention, including C.R.S. §§ 25-1.5-101 and 25-1.5-112 (office of suicide prevention and Colorado suicide prevention plan); C.R.S. § 18-3-104(b) (manslaughter by assisting suicide). An employer may not condition continued employment on an employee's personal pledge to commit suicide, or discharge her for refusing to make one.

192. The Employer Defendants discharged Ms. Fulton because she refused to make that affirmation and because she objected, with her colleagues, to the demand that she make it. Those grounds are independent of, and not remedied by, the statutory claims asserted above.

193. The Employer Defendants were aware, or reasonably should have been aware, that Ms. Fulton's refusal was based on her reasonable belief that the demanded affirmation was contrary to public policy. The Employer Defendants' conduct was willful and wanton.

194. As a direct result, Ms. Fulton has suffered the damages described above and is entitled to compensatory and punitive damages.

## TENTH CLAIM FOR RELIEF
## Outrageous Conduct (Intentional Infliction of Emotional Distress)
## Colorado Common Law
## (Against All Defendants)

195. Ms. Fulton incorporates the preceding paragraphs.

196. Defendants engaged in extreme and outrageous conduct, going beyond all possible bounds of decency, that a reasonable member of the community would regard as atrocious and utterly intolerable. Among other things, Defendants (a) required Ms. Fulton, on

pain of termination and within days, to personally affirm a document containing a pledge to take her own life with a sword, after being told in writing by numerous employees that the pledge should be removed, after one employee asked whether signing meant he had to commit suicide, and after another cited a colleague lost to suicide; (b) kept the pledge in the published document and disguised it rather than removing it; (c) ignored Ms. Fulton's written disclosure that she had been diagnosed with cancer, apart from a two-line personal note from People Operations that addressed nothing about her job; (d) fired her thirteen days later, without reason, while praising her work, so that the staff would learn that organizing does not "cause outcomes inside of the EF"; (e) fired her co-organizer thirty minutes later; (f) told her that her health insurance would lapse within weeks as she began cancer treatment and gave her three days to release her claims or receive "no severance or other benefit"; and (g) then removed the health plan she had been promised she could continue, leaving her to pay more for worse coverage during chemotherapy.

197. Defendants engaged in this conduct intentionally or recklessly, knowing that Ms. Fulton had just been diagnosed with cancer and was uniquely vulnerable, with the intent of causing her severe emotional distress or with reckless disregard of the probability that it would.

198. Mr. Aue personally directed and carried out this conduct. Mr. Buterin participated in adopting and defending the Mandate and the ultimatum, approved or ratified the terminations, and explained them as a deterrent.

199. Defendants' conduct caused Ms. Fulton severe emotional distress.

200. Defendants' conduct was attended by circumstances of fraud, malice, or willful and wanton conduct within the meaning of C.R.S. § 13-21-102.

201. As a direct result, Ms. Fulton has suffered the damages described above and is entitled to compensatory and exemplary damages.

**ELEVENTH CLAIM FOR RELIEF**
**Declaratory Judgment**
**28 U.S.C. §§ 2201–2202**
**(Against All Defendants)**

202. Ms. Fulton incorporates the preceding paragraphs.

203. An actual, substantial, and immediate controversy exists between Ms. Fulton and Defendants concerning the Separation Agreement and concerning whether any claim in this action is subject to arbitration. See **Exhibit 7.** Ms. Fulton contends that the Separation Agreement has been rescinded and is void and unenforceable, and that no agreement requires her to arbitrate any claim asserted here. EAPL contends that the Separation Agreement is valid, that it releases her claims, and that its Singapore arbitration provision is enforceable, including as to the validity of the Agreement itself. Lightsource, which the Separation Agreement names among the parties it purports to release, and Vensure, which on information and belief falls within its definition of released affiliates, will claim its benefit, as will the Individual Defendants. Vensure and Lightsource may also invoke Vensure's form arbitration agreement, and EAPL may invoke the 2026 Supplemental Agreement.

204. The Separation Agreement does not bar Ms. Fulton's claims, for each of the following independent reasons:

205. *Rescission and failure of consideration.* Ms. Fulton rescinded the Separation Agreement on April 17, 2026, eight days after signing it. She has received and retained no consideration under it, and there is nothing to restore. Option A was an unenforceable promise to try to procure a third party's agreement, and no payment has been made and accepted under Option B or paragraph 5.

206. *Release of federal claims not knowing and voluntary.* A release of claims under the ADA and the FMLA is enforceable only if it was knowing and voluntary under the totality of

the circumstances. Ms. Fulton had three days (the Agreement itself recited only "two (2) business days") to consider, review and execute the Separation Agreement, could not obtain counsel in that very limited time, had been diagnosed with cancer eighteen days earlier, had just lost her job and income, faced the imminent loss of her health insurance, and was told that if she did not sign she would receive "no severance or other benefit." She could not and did not negotiate its material terms, and the consideration was illusory and was never accepted.

207. *Duress.* Ms. Fulton signed the Separation Agreement under economic duress created by Defendants' own wrongful conduct, including her unlawful termination and their threat to withhold all severance and health-insurance assistance unless she signed within three days.

208. *The Separation Agreement's own terms.* Paragraph 10 excludes from the parties' settlement "rights resulting from unlawful conduct," and the claims in this action arise from Defendants' unlawful conduct.

209. *Colorado law.* The nondisclosure provision in paragraph 9 is void under C.R.S. § 24-34-407(1) because it does not apply equally to all parties, does not contain the disclosures and statements that statute requires, and is not accompanied by the required signed addendum. Enforcing the Separation Agreement as a release of Ms. Fulton's discrimination claims would also violate the fundamental public policy of Colorado.

210. *Arbitration and choice of law.* For the reasons alleged in Part V.J, paragraph 17 of the Separation Agreement does not reach the claims in this action; is itself, together with any purported delegation of arbitrability, void for duress and unconscionability specific to that paragraph; operates as a prospective waiver of Ms. Fulton's rights under the ADA, the FMLA, and CADA; and is null and void, inoperative, or incapable of being performed within the

meaning of Article II(3) of the Convention. Stiftung Ethereum, Lightsource, Vensure, and the Individual Defendants are not parties to the Separation Agreement and cannot enforce paragraph 17.

211. *No other arbitration agreement applies.* No Defendant has produced a copy of Vensure's form "Mutual Agreement to Arbitrate" signed by Ms. Fulton, Ms. Fulton has no recollection of signing it, and in any event that form does not cover claims against the Foundation or the Individual Defendants and reserves questions of arbitrability to the courts. Ms. Fulton did not sign EAPL's 2026 Supplemental Agreement, which in any event is limited to disputes under that agreement. The arbitration clause in the 2024 Contractor Services Agreement governed an independent-contractor engagement that expired on December 31, 2024, and the clause in the 2025 IP & NDA is limited to disputes concerning confidential information and intellectual property; neither reaches claims arising from the termination of Ms. Fulton's employment.

212. Ms. Fulton is entitled to a declaration that the Separation Agreement has been rescinded and is void and unenforceable; that it does not release, waive, or bar any claim asserted in this action; that its paragraph 17 is void and does not require arbitration of any claim asserted in this action or of any question concerning the validity or arbitrability of those claims; that no other agreement requires Ms. Fulton to arbitrate any claim asserted in this action with any Defendant; that the question of arbitrability is for this Court; and that paragraph 9 of the Separation Agreement is void under C.R.S. § 24-34-407.

## VII. PRAYER FOR RELIEF

Ms. Fulton respectfully requests that the Court enter judgment in her favor and against Defendants, jointly and severally, and award the following relief:

A. A declaration that the Separation Agreement (**Exhibit 7**) has been rescinded and is void and unenforceable; that it does not release, waive, or bar any claim asserted in this action; that its paragraph 17 is void and requires arbitration of nothing asserted in this action; that no other agreement requires Ms. Fulton to arbitrate any claim asserted in this action with any Defendant; that arbitrability is for the Court; and that paragraph 9 of the Separation Agreement is void under C.R.S. § 24-34-407;

B. Back pay and the value of lost employment benefits, with prejudgment interest;

C. Front pay and lost future benefits in lieu of reinstatement;

D. Liquidated damages under 29 U.S.C. § 2617(a)(1)(A)(iii);

E. Compensatory damages for emotional distress, humiliation, and other non-economic harm;

F. Punitive and exemplary damages;

G. The statutory penalty provided by C.R.S. § 24-34-407(2);

H. An additional award to offset the adverse tax consequences of receiving a lump-sum award;

I. Reasonable attorney fees, expert fees, and costs under 42 U.S.C. § 12205, 29 U.S.C. § 2617(a)(3), C.R.S. § 24-34-405, and C.R.S. § 24-34-407;

J. Pre- and post-judgment interest as allowed by law; and

K. Such other relief as the Court deems just and proper.

## JURY DEMAND

Under Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable. Should any Defendant contend that Ms. Fulton agreed to arbitrate any claim

asserted in this action, Plaintiff further demands, under 9 U.S.C. § 4, a trial by jury of every issue concerning the making of any alleged agreement to arbitrate.

Dated: November 4, 2026.

Respectfully submitted,

*/s/ James H. Bartolomei*
James H. Bartolomei
JAMES H. BARTOLOMEI III, P.A.
809 West Third Street
Little Rock, Arkansas 72201
Telephone: (501) 228-7600
Email: james@duncanfirm.com

Michael P. Manapol
LAW OFFICES OF MICHAEL P. MANAPOL
P.O. Box 252
Coppell, Texas 75019
Telephone: (310) 467-7283
Email: michael@manapollaw.com

*Attorneys for Plaintiff Kayleen Fulton*